RICHARD MARMARO (Bar No. 91387)
rmarmaro@skadden.com
JACK P. DICANIO (Bar No. 138782)
jdicanio@skadden.com
MATTHEW E. SLOAN (Bar No. 165165)
masloan@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Tel: (213) 687-5000
Fax: (213) 687-5600

Attorneys for Defendant William J. Ruehle

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>HENRY T. NICHOLAS III and WILLIAM J. RUEHLE,<br><br>Defendants. | CASE NO. SACR 08-139-CJC<br><br>**(1) NOTICE OF MOTION AND MOTION FOR DEFENSE WITNESS IMMUNITY FOR HENRY SAMUELI;**<br><br>*FILED UNDER SEPARATE COVER*<br><br>**(2) DECLARATION OF MATTHEW E. SLOAN IN SUPPORT THEREOF;** and<br><br>**(3) PROPOSED ORDER.**<br><br>Judge: The Honorable Cormac J. Carney<br>Trial Date: October 20, 2009<br><br>Hearing Date: November 24, 2009<br>Hearing Time: 9:00 a.m. |

**MOTION FOR DEFENSE WITNESS IMMUNITY FOR HENRY SAMUELI; Case No. SACR 08-139-CJC**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on November 24, 2009, at 9:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Cormac J. Carney, located at 411 West Fourth Street, Santa Ana, California, Defendant William J. Ruehle, by and through his counsel, will and hereby does move this Court for an order compelling the government to grant Henry Samueli immunity, pursuant to 18 U.S.C. §§ 6001 et seq., so that, if he is called as a witness by Mr. Ruehle, he cannot assert his Fifth Amendment privilege to excuse him from testifying.

Mr. Ruehle's motion is based on this notice, the memorandum of points and authorities below, the separately filed declaration, the pleadings and papers previously filed, the evidence presented thus far in this case, the arguments of counsel, and such other matters as the Court may deem proper to consider.

Respectfully submitted,

DATED:  November 24, 2009

                SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                Richard Marmaro
                Jack P. DiCanio
                Matthew E. Sloan


By:       /s/ Matthew E. Sloan
       MATTHEW E. SLOAN
       Attorneys for Defendant
       William J. Ruehle

---

**MOTION FOR DEFENSE WITNESS IMMUNITY FOR HENRY SAMUELI; Case No. SACR 08-139-CJC**

i

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES................................................1

I. INTRODUCTION ................................................................................................1

II. BACKGROUND ..................................................................................................2

    A. Testimony Of Government Witnesses And Expected Testimony Of Dr. Samueli ................................................................................................2

        1. Options Committee Meetings ......................................................3

        2. December 24, 2001 Grant .............................................................5

        3. Tullos's Allegation That Mr. Ruehle Instructed Her Not To Put Things In Writing ...................................................................7

    B. Mr. Ruehle's Request For Immunity .................................................................7

III. ARGUMENT ........................................................................................................8

    A. Standard For Granting Defense Witness Immunity ..................................8

    B. Dr. Samueli's Testimony Is Relevant .......................................................8

    C. Excluding Dr. Samueli's Testimony Will Distort The Fact-Finding Process .........................................................................................................9

IV. CONCLUSION ...................................................................................................11

# TABLE OF AUTHORITIES

**Cases**                                                                                                                           **Page(s)**

United States v. Lord,
    711 F.2d 887 (9th Cir. 1983) ..................................................................................... 8

United States v. Straub,
    538 F.3d 1147 (9th Cir. 2008) ............................................................................... 8, 9

United States v. Westerdahl,
    945 F.2d 1083 (9th Cir. 1991) ........................................................................... 1, 8, 9

United States v. Young,
    86 F.3d 944 (9th Cir. 1996) .................................................................................. 1, 8

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The Ninth Circuit has observed an elementary truth: "where two eyewitnesses tell conflicting stories, and only the witness testifying for the government is granted immunity, the defendant would be denied any semblance of a fair trial." United States v. Westerdahl, 945 F.2d 1083, 1087 (9th Cir. 1991) (internal quotations and citation omitted). This simple truth – that it is fundamentally unfair for the government to use its superior position to manipulate the evidence heard by the jury – has led the Ninth Circuit to conclude that the government should be compelled to grant immunity to defense witnesses where "(1) the testimony [is] relevant; and (2) the government distorted the judicial fact-finding process by denying immunity." United States v. Young, 86 F.3d 944, 947 (9th Cir. 1996). That is precisely what has happened here.

The government has relied heavily on the testimony of Nancy Tullos, a cooperating witness whom the government agreed not to prosecute for securities fraud and other more serious offenses in exchange for her plea to a single count of obstruction and her agreement to cooperate against Mr. Ruehle. By utilizing this witness and refusing Mr. Ruehle's request to immunize Dr. Samueli, the government has forced a one-sided telling of the events at Broadcom that are the focus of this trial. Dr. Samueli is in many instances the only witness who can contradict key portions of Ms. Tullos's testimony. Indeed, as one of the two members of the Options Committee during the relevant time period, he is far better positioned than she is to testify on the issues she raised here, which focus in large part on the actions of that Committee. Yet, while Ms. Tullos has relied heavily on Dr. Samueli's words and actions to support her beliefs regarding Broadcom's practices, Dr. Samueli has been rendered mute by the government's discriminatory use of its power to grant immunity. Because Dr. Samueli has indicated that he will assert his Fifth

Amendment privilege if he is called to testify,[1] Mr. Ruehle will be deprived of valuable exculpatory testimony unless the Court grants Mr. Ruehle's request to immunize Dr. Samueli. At a minimum, the Court should hold an evidentiary hearing to determine whether the jury's fact-finding has been compromised by the government's selective use of its immunity power.

## II. BACKGROUND

### A. Testimony Of Government Witnesses And Expected Testimony Of Dr. Samueli

As the testimony in this trial has demonstrated, Henry Samueli was at the heart of many of the events charged in the indictment – indeed, the government characterized him as one of Mr. Ruehle's co-conspirators. In its opening statement, the government identified five key players in the purported scheme: Mr. Ruehle (who is on trial), Dr. Henry Nicholas (who is awaiting trial), Dr. Samueli (who is awaiting sentencing), David Dull (the subject of Mr. Ruehle's concurrently filed motion), and Ms. Tullos. (Ex. 4 (Trial Tr. 10/23/09 28:15-29:4; 38:15-17).) Yet, the government wants the jury to hear only Ms. Tullos's version of events – no one else's. Ms. Tullos has pled guilty and is cooperating with the government in the hope of securing a lenient sentence. She thus has an incentive to support the government's version of events. Unless this Court grants immunity to Dr. Samueli (and Mr. Dull, who is the subject of Mr. Ruehle's companion motion), however, she may be the *only* one of these key witnesses who will testify before the jury. The government has refused to grant Dr. Samueli immunity despite the fact that he will likely contradict key portions of Ms. Tullos's testimony and therefore provide powerful exculpatory testimony on Mr. Ruehle's behalf.[2] Due process demands

---

[1] Declaration of Matthew E. Sloan ("Sloan Decl.") ¶ 9. All references to "Ex." are to the exhibits attached to the Sloan Decl., filed herewith.

[2] In order to mitigate any unnecessary delay, Mr. Ruehle is filing this motion concurrently with his request to the government to grant Dr. Samueli immunity

*cont'd*

**MOTION FOR DEFENSE WITNESS IMMUNITY FOR HENRY SAMUELI; Case No. SACR 08-139-CJC**

2

more. Mr. Ruehle should be allowed to have another eyewitness to Broadcom's stock option process, who has a different recollection than Ms. Tullos, report his version of events to the jury. There are several areas of inquiry in which Dr. Samueli's testimony is vital to rebut Ms. Tullos's allegations and protect Mr. Ruehle's right to a fair trial, including the following:

### 1. Options Committee Meetings

At trial, Ms. Tullos testified that the Options Committee did not actually meet on the days that they purported to have met (Ex. 5 (10/30/09 Trial Tr. 803:21-806:20).) She claims, instead, that Mr. Ruehle retroactively selected days with attractive stock prices and announced that there had been an Options Committee meeting on those dates. (Id.) Indeed, Ms. Tullos testified that it was understood both by Mr. Ruehle and Dr. Samueli that the idea of the Options Committee meeting was a euphemism for Mr. Ruehle choosing a date – that references to meetings were a pretense that was maintained by company executives and a "bit of a joke." (Ex. 5 (10/30/09 Trial Tr. 870:19-872:16).) Ms. Tullos testified that her belief that the Options Committee did not meet arose, in part, from her communications with Dr. Samueli. (Ex. 5 (10/30/09 Trial Tr. 809:22-24 ("Q Did you have discussions with Dr. Samueli which caused you to conclude that the Stock Option Committee was not real? A Yes.")).) Indeed, she claimed that although he was one of the two members of the Options Committee, Dr. Samueli sometimes called her to find out if the Options Committee had met. (Ex. 5 (10/30/09 Trial Tr. 809:25-810:14, 870:23-24 ("Q. Henry Samueli would ask you when the Option Committee met? A. Yes.")).) She also testified that Dr. Samueli would ask her if Mr. Ruehle had picked a date. (Ex. 5 (10/30/09 Trial Tr. 810:18-811:7).) Ms. Tullos told the jury that the same thing was

---

pursuant to 18 U.S.C. §§ 6001 et seq. (Sloan Decl. ¶ 10.) It is anticipated that the government will refuse Mr. Ruehle's request. (Id.)

**MOTION FOR DEFENSE WITNESS IMMUNITY FOR HENRY SAMUELI; Case No. SACR 08-139-CJC**
3

true with respect to the Compensation Committee.  (Ex. 5 (10/30/09 Trial Tr. 807:7-14).)

Mr. Ruehle expects that Dr. Samueli will forcefully dispute Ms. Tullos's allegations.  Dr. Samueli has testified under oath before the SEC that the Options Committee, which consisted of Dr. Nicholas and him, in fact had frequent, informal meetings.  (Ex. 2 (Samueli SEC 5/25/07 Tr. 123:2-126:3, 179:4-181:1).)

> Since our offices were next door to each other, obviously, we could see each other in the hallway, and if he was done with a meeting, I could run into his office, and he'd run into my office, and we would just try to get together on a narrowly regular basis.  Especially in the earlier years, I believe it was weekly.  Typically, times where we would just meet either in my office or his office typically face-to-face.  Occasionally, it could have happened by phone, then come to an agreement that, "Yes, we are going to grant options today."

(Ex. 2 (Samueli SEC 5/25/07 Tr. 124:17-125:4).)  Contrary to Ms. Tullos's assertion that Mr. Ruehle was tasked with picking options dates and informing her and Dr. Samueli when the meetings had occurred, Dr. Samueli has explained that on those occasions when Mr. Ruehle did not join the informal meetings, Dr. Nicholas or Dr. Samueli would relay to Mr. Ruehle when Dr. Nicholas and he had met.  (Ex. 2 (Samueli SEC 5/25/07 Tr. 127:24-128:11).)

Dr. Samueli has likewise testified under oath that the options prices were set at the Options Committee meetings: "we would make the grant at the closing price on the day we met."  (Ex. 2 (Samueli SEC 5/25/07 Tr. 134:11-15).)  He has testified that it was his "practice" to have a meeting with Dr. Nicholas on the grant date for each option grant, and that he would "be surprised" if there were any occasions on which they had not met on the grant date.  (Ex. 2 (Samueli SEC 5/25/07 Tr. 128:17-129:3).)  Indeed, he understood that there would be "accounting consequences" if they did otherwise and that Broadcom's "process and policy was to grant at fair market value."  (Ex. 2 (Samueli SEC 5/25/07 Tr. 134:4-24).)  Contrary to Ms. Tullos's

suggestion, moreover, Dr. Samueli has testified that he did not believe Mr. Ruehle changed any dates after the Options Committee met. (Ex. 2 (Samueli SEC 5/25/07 Tr. 129:21-130:1).) When asked, "[D]id you ever reach back and pick a day because the price was going up and there was a lower price in the past?," Dr. Samueli responded: "No, that was not our practice. We did not look back at dates." (Ex. 2 (Samueli SEC 5/25/07 Tr. 180:13-17).)

### 2. December 24, 2001 Grant

Dr. Samueli's anticipated testimony will also directly contradict Ms. Tullos's testimony concerning the timing of the December 24, 2001 grant of options to employees who participated in the June 2001 tender offer. This grant was one of the focal points of the government's case-in-chief. Ms. Tullos testified that she did not believe that the Options Committee had decided to grant the December 24 options until approximately January 4, 2002, and that the December grant was therefore backdated. (Ex. 6 (11/3/09 Trial Tr. 1049:20-24).) Ms. Tullos's opinion is based almost entirely on her interpretation of a series of emails from late December 2001 and early January 2002, however. (Ex. 6 (11/3/09 Trial Tr. 1035:15-1050:15).) In one, dated January 4, 2001, Mr. Ruehle writes to Dr. Nicholas, Dr. Samueli and others that he "VERY strongly recommend[s] that these options be priced as of December 24." (Ex. 7 (Govt. Ex. 1874).) Ms. Tullos reads this email as evidence that the Options Committee backdated the options from January 2002 to December 24, 2001. (Ex. 6 (11/3/09 Trial Tr. 1043:4-14); Ex. 7 (Govt. Ex. 1874).) In a second email, sent about five minutes after Mr. Ruehle's email, Dr. Samueli responded by stating: "I agree. We may not see the $39.75 price again before January 31. It would be far too risky to wait and see." (Ex. 6 (11/3/09 Trial Tr. 1045:4-1046:1); Ex. 7 (Govt. Ex. 1874).) Ms. Tullos told the jury that, in her opinion, Mr. Ruehle's email and Dr. Samueli's response were evidence that the Options Committee had not met and that the December 24 grant was backdated. (Id.; see also Ex. 6 (11/3/09 Trial Tr. 1049:20-24 ("Q Based upon the e-mails that we have seen and your communications

with the Defendant, Dr. Nicholas, and Dr. Samueli, is it possible the Option Committee met and granted options on Christmas Eve? A No.").)

Mr. Ruehle anticipates that if Dr. Samueli is immunized and permitted to testify, he will provide a far different account of the December 24 grant and the related emails. Dr. Samueli has previously testified under oath that because December 24 was the first day available to grant the options after the June 24 tender offer, "our plan all along, even well before December 24th, was to do the cancel and re-grant on December 24th." (Ex. 3 (Samueli SEC 7/12/07 Tr. 329:15-16).)

> [F]or months prior to that date, we had been talking about pricing it on the first day of the open window, since the employees were extremely anxious to get their grants. They had been waiting for six months. So, in my mind, all along we had planned on the 24th as the date to price those shares.

(Ex. 3 (id. at 330:15-20).) As a result, Dr. Samueli was not certain that he and Dr. Nicholas actually met on that date, or whether they simply agreed in advance that it would be the grant date. (Ex. 3 (Samueli SEC 7/12/07 Tr. 331:7-14).) In either case, the December 24 date had been set by December 24 at the latest.

Dr. Samueli has previously testified that he has no specific recollection of Mr. Ruehle's January 4 email and his response (Ex. 3 (Samueli SEC 7/12/07 Tr. 329:24-330:4, 332:5-19), but his first-hand understanding of those emails, to which he was a party, is directly contrary to Ms. Tullos's interpretation. Dr. Samueli has explained, under oath, that he interpreted the emails to mean that he and Dr. Nicholas should adhere to the December 24 date because it had already been chosen.

> I was speculating that if we had this window from December 24th to January 31st, and [the] price happened to be very good on December 24th, why should we risk and wait to price it later on in that window and take the risk that the price goes up.

(Ex. 3 (Samueli SEC 7/12/07 Tr. 330:21-333:1).)

### 3. Tullos's Allegation That Mr. Ruehle Instructed Her Not To Put Things In Writing

Mr. Ruehle anticipates that Dr. Samueli will also contradict Ms. Tullos's testimony that, after the Enron and Worldcom scandals, Mr. Ruehle instructed her "not to put things in writing," a theme that played a central role in the government's opening. (Ex. 4 (10/23/09 Trial Tr. 49:18-52:3); Ex. 6 (11/3/09 Trial Tr. 1057:16-1058:3).) More specifically, Ms. Tullos told the jury that during a meeting with Mr. Ruehle and Dr. Samueli on July 16, 2002, Mr. Ruehle told her not to put details of the July 3, 2002 focal grant in writing because "he did not want to leave an e-mail trail of unfavorable dates." (Ex. 6 (11/3/09 Trial Tr. 1102:11-17, 1103:6-7).)

Based on the statements Dr. Samueli made at his Kaye Scholer interview in 2006, Dr. Samueli will contradict Ms. Tullos's testimony. In his interview, Dr. Samueli stated that he "had never discussed suppressing information with Nancy or Bill." (Ex. 1 (Samueli Kaye Scholer Interview Memo 10/21/06 at 10).) He also said that he had never "heard anything about not putting things in writing." (Ex. 1 (id. at 13.).)

### B. Mr. Ruehle's Request For Immunity

In light of the compelling need for Dr. Samueli's testimony, concurrent with the filing of this motion, Mr. Ruehle's counsel intends to request that the government grant Dr. Samueli "use" immunity under 18 U.S.C. §§ 6001 et seq. to testify at trial. (Sloan Decl. ¶ 10.) It is anticipated that the government will refuse this request. (Id.)[3]

---

[3] Should the government agree to grant Dr. Samueli immunity, Mr. Ruehle will withdraw his motion forthwith.

## III. ARGUMENT

### A. Standard For Granting Defense Witness Immunity

The Court has the authority to compel the government to grant immunity if due process so requires. In order to qualify for defense witness immunity, defendants must meet the requirements established in United States v. Lord, "defendants must show that: (1) the testimony [is] relevant; and (2) the government distorted the judicial fact-finding process by denying immunity." United States v. Young, 86 F.3d 944, 947 (9th Cir. 1996) (citing United States v. Lord, 711 F.2d 887, 892 (9th Cir. 1983)).

The misconduct that satisfies the second prong "is not confined solely to situations in which the government affirmatively induces a witness not to testify in favor of a defendant." United States v. Westerdahl, 945 F.2d 1083, 1086-87 (9th Cir. 1991). "The alternative way that a defendant may satisfy the second prong of the [Lord] test is by showing 'that the prosecution granted immunity to a government witness in order to obtain that witness's testimony, but denied immunity to a defense witness whose testimony would have directly contradicted that of the government witness.'" United States v. Straub, 538 F.3d 1147, 1158 (9th Cir. 2008) (citations omitted). The same analysis applies when the government uses the testimony of a witness who entered into a plea agreement but denies immunity to a witness who disputes the cooperating witness' testimony. See, e.g., Young, 86 F.3d at 948 (finding danger to the fact-finding process where the only two witnesses who implicated the defendant in a conspiracy had received "favorable plea agreements").

### B. Dr. Samueli's Testimony Is Relevant

"To satisfy the first prong of the Lord test, a defendant need not show that the testimony sought was either 'clearly exculpatory' or 'essential to the defense'; the testimony need be only relevant." Westerdahl, 945 F.2d at 1086 (citation omitted). Here, the testimony that Mr. Ruehle seeks to elicit goes to several of the key events

and factual issues in this case so relevance is beyond dispute. Indeed, Dr. Samueli is expected to testify on many of the same topics as Ms. Tullos, including Options Committee meetings; the December 24, 2001 grant; and Ms. Tullos's allegations that Mr. Ruehle told her not to put things in writing at a meeting with Dr. Samueli.

### C. Excluding Dr. Samueli's Testimony Will Distort The Fact-Finding Process

As discussed above, Mr. Ruehle can meet the second prong of the <u>Lord</u> test by showing that the government's selective use of immunity and a plea bargain for its own witnesses while denying immunity to Mr. Ruehle's witness has distorted the fact-finding process. See <u>Straub</u>, 538 F.3d at 1158; <u>Westerdahl</u>, 945 F.2d at 1087. In meeting this prong, Mr. Ruehle need not make any showing as to the government's intent – rather, "a showing that the selective denial of immunity ***had the effect*** of distorting the fact-finding process is sufficient." <u>Straub</u>, 538 F.3d at 1158 (rejecting the notion that the defendant must show that "the prosecution had the 'deliberate intention of distorting the fact-finding process.'") (emphasis added, citations omitted).

As the Ninth Circuit has explained, the reasoning underlying this rule can be articulated using a simple example: "where two eyewitnesses tell conflicting stories, and only the witness testifying for the government is granted immunity, the defendant would be denied 'any semblance of a fair trial.'" <u>Westerdahl</u>, 945 F.2d at 1087 (citation omitted). The same situation is presented whenever the government relies on testimony from immunized witnesses, or witnesses who have received favorable plea bargains, and yet refuses to immunize witnesses who could contradict them. For example, in <u>Westerdahl</u>, the Ninth Circuit observed:

> Here, the government's case relied heavily on circumstantial evidence provided by the testimony of two witnesses who had been granted use immunity by the government, and one witness who testified as part of a plea bargain in which a host of felony charges pending against him were dropped. The use of this testimony,

**MOTION FOR DEFENSE WITNESS IMMUNITY FOR HENRY SAMUELI; Case No. SACR 08-139-CJC**
9

> while effectively denying Westerdahl the right to contradict it with Goldsberry's testimony, may have distorted the fact-finding process, and an evidentiary hearing should have been held to determine whether the denial of use immunity for Goldsberry denied Westerdahl his due process rights.

Id.

Here, Ms. Tullos, the government's plea-bargained witness, has become the spokesperson for "what really happened" with respect to Options Committee meetings, the December 24, 2001 grant, and other key matters. Moreover, Ms. Tullos's testimony has implicated her communications with Dr. Samueli *at nearly every meaningful turn*. (See, e.g., Ex. 5 (10/30/09 Trial Tr. 809:22-24 ("Q Did you have discussions with ***Dr. Samueli*** which caused you to conclude that the Stock Option Committee was not real? A Yes."); 826:9-13 ("Q And we spoke about this before: is it possible the stock option committee granted Dr. Nayebi's stock options on May 25? A No. Q We know that from ***Dr. Samueli's*** e-mail the day after? A Yes."); 870:23-24 ("Q ***Henry Samueli*** would ask you when the Option Committee met? A Yes.")); Ex. 6 (11/03/09 Trial Tr. 1049:20-24 ("Q Based upon the e-mails that we have seen and your communications with the Defendant, Dr. Nicholas and ***Dr. Samueli,*** is it possible the Option Committee met and granted options on Christmas Eve? A No.") (emphasis added)).) Yet, only Ms. Tullos has been permitted to speak to the jury. Ms. Tullos is telling one side of these stories – the government's side. Without immunity for Dr. Samueli, that will be the only side of the story that can be told. The jury will be deprived of essential testimony from Dr. Samueli refuting the testimony of the government's main cooperator, and Mr. Ruehle will be deprived of his right to a fair trial with a full, robust exploration of the facts.

As the Ninth Circuit recognized in <u>Lord</u>, <u>Westerdahl</u>, <u>Young</u>, and <u>Straub</u>, this kind of distortion of the fact-finding process is patently unfair and violates due

process. The government should not be allowed to skew the jury's perception by limiting the voices they hear. Mr. Ruehle's right to a fair trial will only be preserved if Dr. Samueli is granted immunity to permit him to testify.

## CONCLUSION

For the foregoing reasons, Mr. Ruehle respectfully requests the Court to compel the government to grant Henry Samueli use immunity, pursuant to 18 U.S.C. §§ 6001 et seq., so that he may be compelled to testify at Mr. Ruehle's trial.

DATED: November 24, 2009

        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
        Richard Marmaro
        Jack P. DiCanio
        Matthew E. Sloan

        By:  /s/ Matthew E. Sloan
            MATTHEW E. SLOAN
            Attorneys for Defendant
            William J. Ruehle

PROOF OF SERVICE

I hereby certify that I caused the foregoing to be filed with the Clerk of the Court by using the ECF system which sent notification of the filing to the following:

> Brendan V. Sullivan, Jr.
> WILLIAMS & CONNOLLY LLP
> 725 Twelfth St., N.W.
> Washington, DC 20005
>
> James D. Riddet
> STOKKE & RIDDET
> 3 MacArthur Place, Suite 750
> Santa Ana, CA 92707
>
> Robb C. Adkins
> UNITED STATES ATTORNEY'S OFFICE
> 411 W. Fourth St., 8th Flr.
> Santa Ana, CA 92701

By: _____/s/ Matthew E. Sloan_____
           MATTHEW E. SLOAN